Judge Nicholas
delivered the Opinion of the Court.
This is a suit in chancery instituted by Mrs. Smiley, to recover her share of the proceeds of the sale of certain slaves of her deceased husband, who died intestate, and childless. By an agreement between her, the heirs and administrator of her husband, the slaves had been sold by the administrator, and the proceeds retained by him, to . , . . . „ . , i , . await the determination ot the question, whether by law she was entitled to a half, or only a third, of the slaves for life. The circuit court determined that she was entitled to only one third of the money for life, and that she should obtain that, only on the previous condition of her entering into bond, with sufficient surety, to refund it to the heirs, at her death. It is now contended in her behalf, that she was entitled to the value of her life estate in a moiety of the slaves j and, if only to a third, then the value of that third should have been decreed to her absolutely, instead of the use of a third of the proceeds of the sale for life, and in any event, that it was improper to impose upon her the condition of giving security to refund the money at her death.
The first question arising out of the case, is, whether she was entitled to a half, or only a third, of the slaves for life.
By the act of 1798, slaves descend and pass as real estate— the act of 1797, for the distribution of intes-tates’ goods and chattels, therefore does not ap ply to them,and the right of the •widow to dower in the husband’s slaves depends on the common law, (restricted by statute;)and she takes, for life, a third part of the . slaves of which he diedpossess-ed-not of those which he had held, but had parted with.
The 28th section of the act of 1797 — 1 Dig. 527, pro, vides, that when “ any person shall die intestate as to his goods and chattels, or any part thereof, after the funeral debts and just expenses paid, if there be no child, one moiety, or if there be a child, one third, of the surplus shall go to the wife ; but she shall have no more than the use for her life of such slave as shall be in her share.” At the passage of this act, slaves were, as they are here treated, personalty.
By the 28th section of the act of 1798 — 2 Dig. 1155, it is declared, that slaves shall be real estate, “and shall descend to the heirs and widows of persons departing this life, as lands are directed to descend in and by an act of assembly entitled, an act directing the course of descents.”
This act, by converting slaves into real estate, abstracted them from that class of property denominated goods and chattels, and consecpiently placed them without the letter of the above cited section of the act of 1797,which directs the distribution of an intestate’s goods and chattels. But it is insisted, that, as the act of 1798 makes no specified provision for a widow out of an intestate’s slaves, either by its own clauses, or by force of the reference to the statute of descents, she can take no part of the slaves, except by virtue of the statute of distributions ; and therefore, the court should not give such effect to the act of 1798, as to vacate the provision made for her in the statute of distributions. If we could concede that the act of 1798 does give her no interest in the slaves, we should be bound to accede to the conclusion, to which we are urged ; for we could never presume the legislature intended to strip her of all interest in the slaves, and would resort to any allowable construction of the statutes, to prevent such result.
We lay no stress upon that part of the act of 1798 which says, slaves shall descend to the heirs and widows of intestate persons, as lands are directed to descend by the act of descents. A dower right does not come by descent, and besides that mode of expression being a very inappropriate one to designate a dower interest, the statute of descents to which reference is made to shew *95 bow slaves shall descend to the widow, makes no provision for a dower interest. The only mention made of the widow, in the statute of descents, is where she is constituted heir to her husband, when he dies without kindred. We, therefore, can place no more effect upon the act, than if the words, “ shall descend to the heirs and widow as land,” had been entirely omitted.
A widow, by the common law, is entitled to be endowed of one-third part of all the lauds, tenements and here-ditaments of which her husband was seized during cover-ture. When slaves were converted into real estate, and a descendible quality thereby given to them, they were brought within the operation of the coipmon law rule, which provides for the widow’s dower. For it will be found on examination, that her dower right was not restricted to what was literally and strictly speaking land, but embraced all or nearly all of that description of moveable property that was denominated real estate, and which went to the heir, instead of the personal representatives. Among the things of that description which are enumerated by Lord Coke as subject to her claim, he expressly mentions that she was entitled to dower out-of a villein. See Co. Lit. 32 a, 164 b. What would have been the effect upon such slaves as the husband sold in his life time, as to her clower claim, if the legislature had not, in subsequent clauses of the act, manifested an intention, inconsistent with any such claim, we need not determine. If the opinion we have expressed, that the mere circumstance of converting slaves into real estate, had the effect of entitling the widow to one third of those her husband died possessed of, needed any confirmation from an express indication of legislative intention, it could be found in that part of the act of 1798, where it speaks of the widow’s right in her intestate husband’s slaves as a “ dower” right, a phrase of settled legal signification, and wholly inappropriate to the designation of a distribution right out of personalty.
We concur, therefore, with the circuit court, that Mrs. Smiley was entitled to only one third of the slaves for life ; but cannot agree with that court as to the mode *96 of compensating her for that interest out of the proceeds of the sale.
The heirs, administrator and widow having agreed, that the slaves of the. intestate should he sold, and the proceeds divided according to their respective rigbts-held,that the widow is entitled-not merely to the use of her proportion of the money for life, upon giving security for its payment to the heirs upon her death-but to so much, absolutely, as her life estate in one third of the slaves may be worth, tefevence being bad to their productiveness, by 'hire, ^e.
By the agreement to sell the slaves, we can infer nothing but a mutual understanding that the proceeds were to be divided between the widow and heirs, according to the value of their respective interests. She was willing to take, in money, the value of her life éstate in her third of the negroes, and they to receive, in like manner, the value of their residuary interest. If the heirs receive at her death, the whole amount of what a third of the slaves sold for, they are secured the full value of the slaves at her death, without running, the hazard, which they would otherwise have had to incur, from the death of the slaves, or their depreciation in value, from the widow’s use of them during life. On the other hand, if the widow has only the use of the money during life, with the obligation of returning the whole of the principal at her death, she is made to commute the use, or value of the hire, of the slaves, for six per cent, per an-num interest on the money, which is by no means a fair equivalent. A slave worth only.from four to five hundred dollars, may command from seventy to one hundred dollars for a year’s hire, whilst the interest on his value is only from twenty four to thirty dollars. It is true, that if she retained the slave, and used or hired him out, she would havé to incur the hazard of his death, whilst if she takes the money, there is no hazard of its destruction in its use. But it has often been determined, in usury cases, that the value or cost of this hazard, is by no means equivalent to the difference between the value of the hire and. the interest on his price.
However, without resorting to our personal knowledge to ascertain the existence of such difference in point of fact, it is enough that we do know that there may be such difference, and we think the rule of compensation to her, should be, to decree her, absolutely as her own, whatever may be the value of her life estate. We should deem it an unanswerable argument in favor of this mode of adjustment, even if there were no other in favor of it, that it obviates the necessity of compelling her to give *97 'security for refunding the money at her death, which is a condition she may not be able to, comply with.
The value of ail interest in slaves involved in a suit in chancery, should he ascertained by ajury
What is the value of her life estate, depends upon such •a variety of circumstances, some of which must necessarily be peculiar to each case, that it is impossible to lay down any general rule for ascertaining it. Like all other questions relatiye to the value of property, it is best ascertained by the adjustment of a jury, from the proof of witnesses.
The decree must be reversed, with costs, and the cause remanded, with directions to ascertain, by the verdict of a jury, the value of the complainant’s life estate in the slaves, and for a decree to be rendered in her favor against, the administrators, for the value so ascertained.